UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Matthew James Conaway, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-03532 |
| | ) | |
| The University of Chicago, | ) | Honorable John Robert Blakey |
| | ) | |
| Defendant. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiff Matthew James Conaway, by his attorney, Glenn E. Heilizer, for

his complaint against defendant, The University of Chicago, states as follows.

**PARTIES, JURISDICTION AND VENUE**

1.     Plaintiff is a citizen of Illinois.

2.     Defendant is an Illinois not-for-profit corporation that operates an

academic and research institution, with its principal place of business located in

Chicago, Cook County, Illinois.

3.     The Court has jurisdiction over the subject matter of this lawsuit,

because the matter in controversy arises under the Constitution, laws, or treaties of the

United States, within the meaning of 28 U.S.C. § 1331.  Additionally, the Court has

supplemental jurisdiction over plaintiff's state law claims within the meaning of

28 U.S.C. § 1367.

4.     Venue is proper in the Northern District of Illinois because

defendant resides in the Northern District of Illinois within the meaning of 28 U.S.C.

§ 1391, and because a substantial part of the events and omissions giving rise to the claims occurred within the Northern District of Illinois.

## FACTS

### *Plaintiff's disabilities and educational background*

5.　　Plaintiff is a disabled individual with severe congenital spastic athetoid quadriplegic cerebral palsy, a neurological condition that causes plenary and involuntary movements, including plaintiff's head, arms, legs and hands, as well as abnormally high movement-associated muscle tightness.　Plaintiff uses a head-controlled power wheelchair, operates a computer with a mouthstick, and has limited functional use of his limbs and moderately garbled speech.

6.　　Plaintiff requires total yet intermittent assistance for all activities of daily living, but otherwise lives independently and is, at 47 years of age, in good general physical health.

7.　　In addition to his physical condition, plaintiff developed symptoms of post-traumatic stress disorder, arising from traumatic abuse by others over the course of plaintiff's life.　Plaintiff was diagnosed in 2002, after he moved to Iowa City for his doctoral program, and received psychotherapy for this disorder over a number of years.

8.　　Symptoms of plaintiff's post-traumatic stress disorder, which can be elicited by any number of triggering events, include episodic bouts of uncontrolled anger, rage and sadness, hypervigilance, anxiety, and flashbacks resulting from (a) the physical, mental, emotional, religious, spiritual, and sexual abuse from family members, caregivers, and school employees; (b) the childhood medical treatments that he

- 2 -

endured; (c) family violence resulting from the hostile divorce of his parents and their subsequent remarriages to other spouses; (d) constant fear of institutionalization; and (e) dealing with extreme prejudice against his disability by teachers and students in public school.

9.  Despite those disadvantages, plaintiff has dedicated his life to becoming an accomplished scholar, researcher, and educator as well as a third-generation doctor in the esteemed tradition of learning and service commenced in the 1920s by his grandfather, the late Rev. Dr. F.E. Conaway.

10.  After obtaining consecutive bachelor's degrees in engineering and applied mathematics as a Dean's List student with a premedical focus at Georgia Tech where he was elected to Pi Mu Epsilon, plaintiff studied at The University of Michigan, where he received a Master of Public Health in General Epidemiology, and then worked as a research assistant in rehabilitation engineering.

11.  Subsequently, plaintiff attended The University of Iowa, first earning a Master's degree focusing in Ergonomics, followed by a Ph.D. in Biomedical Engineering.  Plaintiff's Ph.D. work was funded in part by his own mentored fellowship from the National Institutes of Health (NIH) for his final dissertation year, and service as research and teaching assistant.

12.  Plaintiff's doctoral dissertation was nominated for the Outstanding Dissertation Prize at The University of Iowa.  In addition, plaintiff also served as a Volunteer Patient to help train health profession students on disability issues through

the University of Iowa Center for Disabilities and Development ("UICDD"). Plaintiff's

work at UICDD, among other things, actively kindled his interest in bioethics.

13.    Plaintiff's post-doctoral work began at Ohio University, where he

held his own mentored National Institutes of Health (NIH) research fellowship in

theoretical physiology from September, 2011 to June, 2013. Due to the paucity of

appropriate support services for plaintiff in the rural environment in and around

Athens, Ohio, plaintiff performed the position remotely and exclusively via the Internet.

This arrangement was enthusiastically sanctioned by Ohio University as well as NIH.

The fellowship was sponsored by the university's Division of Biomedical Sciences as

well as its Heritage College of Osteopathic Medicine. Plaintiff's duties included

performing mathematical modeling of age-related change in skeletal muscle, assisting in

writing grants, and participating in peer reviews of related scientific papers submitted

for publication in academic biomedical journals. Plaintiff's work was featured during

the 2011 National Postdoctoral Appreciation Week.

14.    Next, following the events described in this complaint, plaintiff

enrolled at Loyola University Chicago, where presently he is working on a Master's

degree in Bioethics and Health Policy, and where he also serves as assistant instructor at

Loyola's Stritch School of Medicine, Neiswanger Institute for Bioethics and Health

Policy. Plaintiff further intends to obtain a Doctor of Bioethics degree with

specialization in research ethics and/or public health ethics. Through his work at

Loyola, plaintiff has become a highly respected leader among colleagues with his

expertise and personal experience, and recently was asked to co-author a textbook on

Biotechnology and Bioethics with Neiswanger faculty.  Ultimately, plaintiff intends to secure an institutional appointment as full Professor of Bioethics.

15.     Plaintiff further has published a several online articles as well as a monograph, based on his doctoral dissertation, on the effect of calcium leak current in low-frequency fatigue in paralyzed muscle, and also has co-authored several articles based on his post-doctoral work on age-related changes in muscle quality.

16.     Plaintiff additionally speaks and reads German with various fluencies, studies comparative German linguistics, and has been entrusted with performing translations of sensitive materials written in German.

### *Defendant's background and anti-discrimination policies*

17.     Defendant was founded in 1890, and describes itself as "[o]ne of the world's premier academic and research institutions."  By fostering "new ways of thinking," defendant goes on, its campuses have developed into "intellectual destination[s]" and "the nexus of ideas that challenge and change the world."

18.     Each academic year, defendant publishes a student manual reflecting its policies and regulations.   For the 2012-13 academic year, which was the first year of plaintiff's enrollment as set forth below, defendant's student manual reflected the following policies against harassment and discrimination based on disability:

> In keeping with its long-standing traditions and policies, the University of Chicago considers students, employees, applicants for admission or employment, and those seeking access to programs on the basis of individual merit. The University, therefore, does not discriminate on the

basis of . . . disability . . . and does not discriminate against members of protected classes under the law.

. . . .

[U]nlawful discrimination, including harassment, compromises the integrity of the University. It is the intention of the University to take necessary action to prevent, correct, and, where indicated, discipline unlawful harassment.

. . . .

Discrimination based on factors irrelevant to admission, employment, or program participation violates the University's principles. In keeping with its long-standing traditions and policies, the University of Chicago considers students, employees, applicants for admission or employment, and those seeking access to programs on the basis of individual merit. The University does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender identity, national or ethnic origin, age, disability, veteran status, genetic information or other protected classes under the law. Such discrimination is unlawful.

Unlawful harassment . . . is verbal or physical conduct that is so severe or pervasive that it has the purpose or effect of unreasonably interfering with an individual's work performance or educational program participation, or that creates an intimidating, hostile, or offensive work or educational environment.

. . . .

Unlawful harassment includes same sex harassment and peer harassment among students, staff, other academic appointees, postdoctoral researchers or faculty. Unlawful harassment by a faculty member, instructor, or teaching assistant of a student over whom he or she has authority, or by a supervisor of a subordinate, is particularly serious.

19.    In addition, defendant's student manual for the 2012-13 academic year includes a "disability accommodation protocol," through which defendant attempted to implement its policies against harassment and discrimination based on disability, and its acknowledged obligations under the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990.

20.    Pursuant to the protocol, defendant's 2012-13 student manual defines a "qualified student with a disability" as a "disabled student who, with or

without reasonable accommodation (e.g., architectural access, communication aids/services, or modifications to policies and practices) meets the University's academic and technical standards required for admission or participation in the University's educational programs or activities."

21.     The protocol contemplates that defendant will first make a disability determination, then implement "any appropriate academic modification or adjustment, for which the student with a disability qualifies," based on specified factors. The protocol's express intent is to "enable the student with a disability to have equal access to the student's educational program or to the student life activities for which the student is eligible," through "[a]cademic modifications or adjustments . . . [that] are individualized based on the functional limitations caused by the student's disability, academic program requirements and the student life activities."

### *Defendant offers plaintiff the opportunity to study bioethics on the condition that plaintiff attend another of its schools or programs*

22.     In or around 2010, plaintiff began to explore opportunities to pursue his interest in bioethics, which originated through his work at UICDD as described above.  Bioethics is a discipline that generally involves the application of ethical principles to biological research and medical procedures, technologies and treatments.  Plaintiff wanted to pursue a course of study in clinical medical ethics, in order to become a consultant and counselor, and possibly pursue a career as clinical ethicist, performing clinical research and conceptual scholarship.

23.     Through his investigation of bioethics educational opportunities, plaintiff learned that defendant had an established program in clinical medical ethics, offered through defendant's MacLean Center for Clinical Medical Ethics (the "MacLean Center").   Defendant has touted its MacLean Center program as the "oldest, largest, and most successful clinical ethics fellowship in the world."

24.     Specifically, plaintiff learned that the MacLean Center offered a number of fellowship positions, where accepted students would study under MacLean Center faculty in the area of clinical medical ethics.  In its materials describing the program, defendant stressed that MacLean Center fellowships were not limited to physicians, but were available to students with varied backgrounds and disciplines, including philosophy, theology, nursing, law, and the social sciences.  At present, the backgrounds of its fellows include medicine, nursing, research, and the practice of law.

25.     In November 2010, plaintiff applied for admission to the MacLean Center fellowship program.  In connection with his application, plaintiff was interviewed by two of defendant's professors, Drs. Mark Siegler and Daniel Sulmasy. The interview occurred by phone on or about February 9, 2011, during which plaintiff had an assistant present to help translate his garbled speech.

26.     Plaintiff subsequently was denied admission to the fellowship program, approximately a week after the interview.  Nonetheless plaintiff remained in contact with Drs. Siegler and Sulmasy and maintained his interest in studying bioethics.

27.     In March 2011, on plaintiff's own initiative, and based on his robust and spirited conversation with Drs. Siegler and Sulmasy, plaintiff contacted both

professors jointly, to determine whether plaintiff could accomplish his objective of studying bioethics with the MacLean Center staff, without his formal acceptance as a fellow in the program.

28.     Specifically, plaintiff inquired whether the MacLean Center would permit and enable plaintiff to collaborate on a research project in clinical ethics, to explore how the autonomy of certain disabled patients exists within the context of the physician-patient relationship.  Plaintiff requested to work with MacLean Center faculty through any and all possible academic mechanisms, including a post-doctoral position on campus.

29.     In or about April 2011, several weeks following plaintiff's inquiry, plaintiff was informed by Dr. Mark Siegler of the MacLean Center that defendant would collaborate with plaintiff on bioethics instruction from MacLean Center faculty, as long as plaintiff "obtained an academic appointment" and "designed a good research project."

30.     The term "collaborate" is a term of art in the academic post-doctoral world.  When an institution agrees to collaborate with a post-doctoral student, that agreement includes not only the promised course of study and oversight of research, but also obligates the institution to offer a funded research position to the post-doctoral student.

### *Plaintiff enrolls in defendant's Divinity School, in reliance on defendant's representations and assurances of access to the MacLean Center*

31.     Plaintiff, in reliance on the representations and assurances of Dr. Siegler regarding his opportunity to study at the MacLean Center, began to

investigate defendant's available schools and programs for the purpose of obtaining an academic appointment and implementing a research project.

32.     In accordance with defendant's representations and assurances, plaintiff considered applying for admission to defendant's Divinity School, for the purpose of receiving bioethics instruction from MacLean Center faculty.  Plaintiff was aware that several MacLean Center faculty members also held appointments in defendant's Divinity School, including Dr. Sulmasy, who joined the MacLean Center as associate director in or about 2010, and remained associate director at all times relevant to this lawsuit.  Dr. Sulmasy additionally served as Editor-in-Chief of the preeminent bioethics journal, *Theoretical Medicine and Bioethics*, for many years.

33.     Plaintiff accordingly contacted Drs. Siegler and Sulmasy a number of times, in and around September, 2011, to discuss the feasibility of being admitted to the Divinity School in Religious Ethics, for the previously discussed purpose of gaining access to MacLean Center instruction.  Drs. Siegler and Sulmasy both encouraged plaintiff to pursue admission to the Divinity School, and gave no indication, at any time, that plaintiff would have any difficulty with access to the MacLean Center or collaboration with MacLean Center staff.  In other words, there was never any admonition or discouragement that collaboration, appropriate mentoring, and/or adequate funding would not be in any way forthcoming from the MacLean Center, as long as plaintiff moved to campus and enrolled in the Divinity School.

34.     Accordingly, in September 2011, plaintiff applied for admission to defendant's Divinity School, in the Master's program, concentrating on religious ethics,

specifically for the purpose of receiving instruction in bioethics through the MacLean Center.

35.     Given plaintiff's already-accomplished academic background, plaintiff had no need to return to school for another Master's degree, much less obtain training in the academic study of religion.  Further, plaintiff had great trepidation about giving up his exceptional support system in Iowa City and relocating to Chicago, where he did not know anyone.   However, plaintiff was enticed to apply to defendant's Divinity School master's program, based on the defendant's promises of access to MacLean Center faculty and courses.

36.     At all times material to this litigation, plaintiff intended to use his Divinity School enrollment and MacLean Center studies to launch his career in medical ethics research, and potentially gain admission into the fellowship program in clinical medical ethics in the future.

### *Defendant promises support and accommodation for plaintiff's disabilities*

37.     In connection with plaintiff's decision to seek admission to defendant's Divinity School, plaintiff additionally took steps to ensure defendant would be able and willing to accommodate plaintiff's physical and emotional needs.

38.     Among other things, plaintiff contacted defendant's Dean of Students in the Divinity School, Teresa Hord Owens, in July 2011.  After plaintiff described his disabilities, and outlined the physical and academic accommodations that were being provided by the University of Iowa, Owens assured plaintiff that defendant was well-equipped to accommodate plaintiff's condition in similar fashion.  Defendant

represented that plaintiff would enjoy the same opportunities for a fulfilling course of study as other students, especially since he desired to work with the MacLean Center, and was fully encouraging of his application to the two-year Master's program, concentrating in Religious Ethics.

39.     Defendant's representations and assurances that defendant would accommodate plaintiff's disabilities was a material inducement for plaintiff's decision to seek admission to defendant's Divinity School.

### *Plaintiff enrolls in defendant's Divinity School*

40.     In March 2012, plaintiff was accepted for admission to defendant's Divinity School in the Master's program with a concentration in Religious Ethics, for the 2012 fall quarter.

41.     Following defendant's offer of admission in March 2012, plaintiff again contacted Teresa Hord Owens, Dean of Students in the Divinity School and again expressed his concerns regarding defendant's ability to accommodate plaintiff's disability.  Plaintiff described the accommodations made by the University of Iowa, and inquired whether defendant was able to provide similar accommodations.  Once again, Teresa Hord Owens, Dean of Students in the Divinity School assured plaintiff that defendant would provide accommodations similar to plaintiff's circumstances while attending the University of Iowa, and that plaintiff would have no impediments in attending classes at defendant's campus.

### *Defendant breaks its promises and agreements by impeding plaintiff's course of study at the Divinity School*

42.     Despite defendant's repeated assurances that plaintiff would be permitted to study bioethics with members of the MacLean Center faculty following plaintiff's enrollment in the Divinity School, defendant flatly disregarded those assurances.  To the contrary, as set forth below, defendant impeded plaintiff's progression through the Divinity School program, failed to accommodate plaintiff's disabilities, then refused to permit plaintiff to seek alternative programs, and finally denied plaintiff access to MacLean Center faculty and instruction.

43.     First, plaintiff encountered a number of significant and substantial physical barriers on defendant's campus, which impeded plaintiff's ability to complete his coursework. Those barriers include following.

A.     Swift Hall had an elevator and an accessible door that chronically were unreliable, and frequently broke down.  As a result, plaintiff's ability to complete his coursework was seriously compromised.

B.     The Office of the Dean and other administrative offices of the Divinity School were located at the top of a flight of 7-8 steps with no elevator access.  Plaintiff was unable to meet with certain of defendant's officials to discuss ongoing issues and requirements, due to those physical impediments.

C.     Buildings such as Cobb Hall, Rosenwald Hall, and others had wheelchair lifts that plaintiff was unable to operate on his own.

- 13 -

   D. The "accessible" door buttons of the Regenstein Library (main library) were not accessible, so that plaintiff could not reach them.

   E. The "accessible" computer workstation in the Regenstein Library was sequestered in a locked room that required keycard access. In contrast, the other workstations were placed in the common area of the Library.

   F. Defendant never provided an accessible computer workstation in Swift Hall, as initially requested by plaintiff.

   G. There was no accessible door button for the Student Disability Services office in Levi Hall.

   H. There was no accessible door on the newly constructed Knapp Center for Biomedical Discovery.

   I. The elevator in Ida Noyes Hall has buttons that are in an inaccessible location. As a result, plaintiff was unable to use that elevator independently.

   J. The ADA Paratransit service proffered by the Defendant was wholly unsafe. The buses were raised off the ground and had wheelchair lifts on the side. Further, the drivers lacked proper training. Scheduling rides was a burdensome, if not impossible, process for plaintiff.

   44. In addition to permitting physical barriers, defendant implemented policies and procedures that unreasonably interfered with plaintiff's coursework and failed to account for his disabilities, including the following.

   A. Defendant's Student Disability Services Department and its Director, Dr. Gregory Moorehead, demanded that plaintiff provide minute and excess

details regarding his prior accommodations at other universities, including the make

and model of every product utilized at other institutions. Although collecting and

compiling this information was a struggle for plaintiff, he was forced to comply, after

Dr. Moorehead implied, in an April 2012 telephone conversation, that noncompliance

would lead to the denial of basic accommodations. Given defendant's utter disregard

for plaintiff's disabilities as alleged in this complaint, defendant's insistence on collecting

such information was all the more unnecessary and harassing.

B.      Defendant refused to supply plaintiff with electronic copies

of textbooks. Instead, defendant demanded that plaintiff purchase hard copies of

textbooks, and deliver them to defendant's Student Disability Services Department for

manual scanning. This procedure, which was not followed at other academic

institutions attended by plaintiff, was unnecessary and unduly burdensome. Due to the

difficulties involved with defendant's delivery-and-manual-scanning requirement,

plaintiff was forced to forego defendant's assistance and find books already in electronic

format entirely on his own.

C.      Defendant was denied access to Divinity School faculty.

Although regular, sustained conversations with advisors or instructors is a core element

of any academic curriculum, defendant would generally not provide access to faculty

unless plaintiff formally scheduled meetings in advance, in writing on a sign-up sheet.

Upon confrontation about the issue in May, 2013, Professor Richard Rosengarten gave

plaintiff the excuse of "that is what we do." Plaintiff was unable to comply with such

rigid demands due to his disabilities, and never been subjected to such onerous requirements at any other university.

45.     Lastly, aside from defendant's physical impediments and unreasonable policies, defendant further engaged in acts of discrimination based on plaintiff's disabilities, and retaliated against plaintiff for attempting to resolve those issues, including the following.

A.     Plaintiff was told that he did not have to come to class by certain instructors, including Professor Michael Sells as of October, 2013. Defendant's excusal of plaintiff from attending classes was not a solution, but rather implicitly recognized that defendant was giving up on any effort to accommodate plaintiff's disabilities.

B.     Academic coursework submitted by plaintiff was on more than one occasion graded low, and plaintiff's writing style was denigrated by Divinity School faculty both orally and in writing.

C.     During the 2013-14 academic year, Plaintiff received course grades of "P" (Passing) rather than letter grades. Such a grade means that work was completed at a "satisfactory" level, and was yet another indication that defendant was giving up on any effort to treat plaintiff similar to non-disabled students. To plaintiff's knowledge, no other student received such grades.

D.     When plaintiff, for health and safety reasons, switched to online independent study and research courses with Professor Sells as of January 2014, there was no further communication from the Divinity School, and no work was

requested for completion by plaintiff.  Again, defendant treated plaintiff as though his studies did not matter.

E.     Plaintiff was patronized by Professor William Schweiker "for being very brave for switching from Engineering to Religion."  Plaintiff took that statement as the thinly veiled condescension that, given plaintiff background and disabilities, plaintiff had no business enrolling in the Divinity School.

F.     On an ongoing basis, plaintiff was subjected to harassment, disrespect, and humiliation by the Divinity School as a whole, including many of the faculty and other students, as "just an MA student."  Recognition of one's degrees is a core element of respect in the academic world; yet many faculty, especially Professors Richard Rosengarten and William Schwieker, and others, declined to acknowledge plaintiff's credentials (earned against astronomical odds), instead addressing plaintiff as "Mr. Conaway" or worse as if they were deliberately trying to humiliate him.  Although plaintiff politely requested to be addressed properly on many occasions, his requests were ignored.   In sum, consistent with other alleged behavior of the defendant in this complaint, plaintiff was not addressed as a senior scholar according to his credentials and was treated like a beginning graduate student by the defendant's faculty.

G.     Plaintiff endured ongoing humiliation from the Divinity School students and staff alike, who routinely attempted to pigeonhole plaintiff as a disabled person.  Specifically, plaintiff would be bombarded by certain Divinity School students, especially Anil Mundra, with forwarded emails about disability events on campus as if he "should" attend them given that he is disabled.   Further, when plaintiff

- 17 -

reached out to the other students for assistance in solving some of the problems, he received backlash from Mundra for "not making things happen" by himself. Plaintiff also received ignorant conversational backlash for defiance of and noncompliance with such unstated norms.

H. Additionally, students and staff subtly yet maliciously excluded plaintiff from academic conversations due to his background and training in engineering and medical science. When plaintiff would offer his perspective to a written or verbal conversation about a topic, he would be treated as an anomaly. Or, faculty would claim that plaintiff made unsound arguments since plaintiff constructs academic arguments and documents in the standard way that is customarily expected of engineers and scientists.

46. Due to the physical barriers and inaccessibilities promulgated or permitted by defendant as set forth above, defendant became dependent on others for his basic movement through the university, and in a real sense, homebound to his living quarters. Plaintiff lost the independence he worked his entire life to achieve, with resulting feelings of inadequacy and desperation, and triggering of his symptoms of post-traumatic stress. Further, Plaintiff suffered frequent stress-induced psychosomatic bouts of respiratory and intestinal distress that directly resulted from the treatment inflicted upon him by the defendant. Indeed, plaintiff was ill for most of his two-year experience on the campus of the defendant. Following plaintiff's departure from the university as set forth below, plaintiff sought therapy in an attempt to alleviate some of

those symptoms and recover from his stress-induced illnesses. Nevertheless, plaintiff remains in hypervigilance and other emotional arousal.

### *Plaintiff's efforts to resolve his concerns are ignored or rebuffed by defendant*

47.    Although plaintiff made various efforts to resolve the difficulties presented by defendant's treatment, those efforts were ignored or rebuffed, as follows.

A.    Once confronted by the numerous physical impediments described above, plaintiff requested various accommodations from defendant in writing. Requested accommodations included, but were not limited to, classroom and elevator access, academic accommodations such as class notes and textbooks, and an accessible workstation with a computer for his use in Swift Hall. Defendant failed to comply with those requests.

B.    In October 2012, plaintiff contacted Professor Dwight Hopkins, director of defendant's Master's program and requested permission to pursue an alternative doctorate. Such a course would have permitted plaintiff to seek a faculty position in medical ethics. However, Dr. Hopkins was evasive and noncommittal, eventually referred the issue to Dean Margaret Mitchell.

C.    Plaintiff next pursued permission for an alternative doctorate from Dean Mitchell, who required plaintiff to make an oral and written presentation before herself and Dean of Students Teresa Hord Owens. Following the presentation, plaintiff was ordered by Dean Mitchell to either completely withdraw from the Divinity School's master's program, as well as the University as a whole, or alternatively comply with the strict requirements of the curriculum by the end of Fall Quarter, 2012.

D.    In February or March 2013, Dean Mitchell approached plaintiff at defendant's Swift Hall, where plaintiff was waiting for his class to begin. After initiating an uninvited conversation with plaintiff, Mitchell, who was standing over plaintiff, placed her elbow on plaintiff's left shoulder and rested it there during the entire conversation.  Plaintiff was in his wheelchair and unable to remove Mitchell's elbow from his shoulder, which plaintiff perceived as a physical threat and violation of his bodily integrity.  Given the confrontation in October 2012, Mitchell acted as if she was claiming victory over the Plaintiff.

### Defendant breaks its promises and agreements by denying plaintiff access to bioethics studies with MacLean Center Faculty

48.    After encountering defendant's various roadblocks as described above, plaintiff became concerned that the promised access to MacLean Center resources was a sham as well.  Despite defendant's promises and assurance that plaintiff would have contact and study with MacLean Center personnel, defendant refused all access, including as follows.

A.    Following Dean Mitchell's ultimatum that he either withdraw from the university or "get in line" with the Divinity School curriculum, plaintiff immediately contacted the MacLean Center for assistance.  However, MacLean Center staff turned plaintiff away and refused to assist him, as though defendant had never agreed to provide plaintiff with access to the Center's bioethics resources.

B.    Plaintiff attempted to study with the MacLean Center's Dr. Siegler, by enrolling in Dr. Siegler's Doctor-Patient Relationship course for the winter

quarter, 2013. However Dr. Siegler, upon learning of plaintiff enrollment, categorically refused course access to plaintiff despite pleas and protestations by email. Plaintiff subsequently was compelled to drop the course.

        C.     Dean Mitchell told plaintiff that transferring to the MacLean Center for academic reasons was not allowed. Plaintiff attempted to explain his prior agreement with defendant, but Dean Mitchell responded that plaintiff's quandary "was his problem."

        D.     After plaintiff continued to pursue the MacLean Center for assistance, MacLean Center staff claimed to lack funding for postdoctoral appointments no earlier than April 2013.

        E.     Plaintiff met with Dr. Sulmasy to discuss spring quarter, 2013 academic accommodations needed by the plaintiff in the only Divinity School course on Medical Ethics. During the meeting, Dr. Sulmasy noted that plaintiff was mismatched with the Divinity School given plaintiff's interest in medical ethics – in square contravention of Dr. Sulmasy's initial encouragements as alleged above -- yet Dr. Sulmasy refused to arrange for any postdoctorate work in medical ethics for Plaintiff.

### *Defendant fails to offer plaintiff employment*

        49.     Prior to plaintiff's enrollment in the Divinity School's master's program, with the belief that he would be permitted to study bioethics with MacLean Center faculty, plaintiff had understood he would also be given the opportunity to secure a research appointment with defendant, as alleged above. This understanding

was based on conversations with Drs. Siegler and Sulmasy in March and April, 2011, and on the general protocol for post-doctorate work in bioethics.

50.     Consequently, as defendant's treatment of plaintiff became increasingly indifferent and at times hostile, plaintiff sought to rescue his investment of time and money in defendant's program, by seeking employment with defendant.

51.     Plaintiff made numerous overtures to defendant's various departments, including the Human Resources office in August and September 2013. The Human Resources office provided no assistance, instead referring plaintiff to the Anixter Center, a non-profit organization that attempts to secure employment for developmentally disabled persons, which was a demeaning and unwarranted response to someone with plaintiff's credentials and prior work history.

52.     Among other things, plaintiff had an extended email exchange and several in-person meetings over a period of four weeks with Sylvia Cain, defendant's work-study coordinator, who ignored plaintiff's requests for a position commensurate with his credentials, and simply forwarded information for one or two menial "disability" positions for undergraduates.  When plaintiff attempted to explain that he wanted to explore federal or other positions in scientific administration suited to his background, possibly at defendant's medical school, Ms. Cain sarcastically responded that "nothing hurts failure but a try," that plaintiff should seek grant writing and scientific administration positions directly, and "[t]here is nothing else that I can do."

53.     Plaintiff additionally applied for roughly forty positions with defendant, including part-time admissions reader, and placement in a professional,

scientific position at defendant's Medical Center.  Defendant's Human Resource Department, via Sylvia Cain, claimed plaintiff was not eligible due to his student status, and insisted on continuing to attempt to pass plaintiff off to "supported employment" agencies.

54.     Further, plaintiff made a written request for placement with Dr. Kenneth Polonsky, Dean of the defendant's Biological Sciences Division (which encompasses the Pritzker School of Medicine as well as the University of Chicago Medical Center). That effort was rejected as well.  Dr. Polonsky never responded to the inquiry made by the plaintiff.

55.     In sum, other than a $750.00 payment for 50 hours of German-to-English translation work for Professor Michael Sells from November 2013 to February 2014, plaintiff had no opportunity for employment, notwithstanding his unending efforts to secure a position.

### *Defendant's conduct amounts to constructive expulsion*

56.     Due to the insurmountable barriers on all levels, the broken promises, and mistreatment, as set forth above, plaintiff felt he had no choice but to sever his relationship with defendant in June 2014, and formally withdrew from the Divinity School, and hence the University, as prescribed by the Dean.   Withdrawal became effective shortly thereafter.

*Plaintiff's damages*

57. Plaintiff has incurred substantial damages resulting from defendant's conduct as set forth above. Those damages include:

A. Approximately $100,000.00 for lost tuition.

B. Approximately $200,000.00 for living expenses that plaintiff otherwise would not have incurred.

C. Approximately $200,000.00 in extra costs for attending the Bioethics Program at Loyola University Chicago, in order to obtain the academic coursework not delivered by defendant.

D. The loss of two years' time, for which plaintiff received nothing more than a gap in his curriculum vita.

E. Emotional anguish, physical symptoms and distress arising from defendant's treatment of plaintiff as alleged above, including the aggravation of his existing post-traumatic stress disorder and comorbid psychosomatic illnesses.

## COUNT I
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

58. Plaintiff incorporates paragraphs 1-57.

59. At all times material to this lawsuit, defendant received federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794.

60. Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his

- 24 -

disability, be excluded participation in, or be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance . . . "

61.    As set forth above, plaintiff has disabilities within the meaning of the Rehabilitation Act.

62.    Plaintiff was otherwise qualified to receive the benefits of defendant's services, programs, and activities.

63.    As set forth above, plaintiff was excluded from participation in or denied the benefits of defendant's services, programs, and activities, and otherwise was discriminated against, on the basis of his disability.

64.    As set forth above, defendant failed to provide plaintiff with reasonable accommodations for his disabilities.

65.    Defendant's conduct violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

66.    Due to defendant's violation of the Rehabilitation Act, plaintiff has incurred damages in excess of $500,000.

67.    Plaintiff is entitled to his reasonable attorney's fees pursuant to 29 U.S.C. § 794a.

Wherefore, plaintiff, Matthew James Conaway, respectfully requests that judgment be entered in his favor and against defendant, The University of Chicago, in an amount in excess of $500,000, to be specifically proven at trial, together with punitive damages, plaintiff's reasonable attorney's fees, costs of suit, and such further relief as is just and proper.

## COUNT II
## <u>FRAUD</u>

68.    Plaintiff incorporates paragraphs 1-57.

69.    As set forth above, defendant made false statements of material fact regarding plaintiff's eligibility for study at the MacLean Center, its policies for accommodating persons with disabilities, and its intention to accommodate plaintiff's disabilities.

70.    Defendant knew or believed that its representations were false.

71.    Defendant knew that plaintiff would rely on its representations when enrolling at defendant's Divinity School, and in fact plaintiff did rely on those representations in enrolling in defendant's Divinity School Master's program.

72.    Plaintiff has incurred damages as set forth above, in excess of $500,000.

73.    Punitive damages are necessary and appropriate to deter defendant and others similarly situated from engaging in such conduct in the future.

Wherefore, plaintiff, Matthew James Conaway, respectfully requests that judgment be entered in his favor and against defendant, The University of Chicago, in an amount in excess of $500,000, to be specifically proven at trial, together with punitive damages, costs of suit, and such further relief as is just and proper.

## COUNT III
## BREACH OF CONTRACT

74.     Plaintiff incorporates paragraphs 1-57.

75.     As alleged above, plaintiff entered into a valid and enforceable agreement with defendant whereby plaintiff would have been able to study and work at the MacLean Center, that defendant would implement its written policies on accommodating disabilities, and that defendant would accommodate plaintiff's disabilities.

76.     As alleged above, defendant breached its agreement with plaintiff by interfering with plaintiff's continued enrollment at the Divinity School, failing to allow access to the MacLean Center, and by failing to reasonably accommodate plaintiff's disabilities.

77.     Plaintiff, for his part, performed all requirements to be performed by him, pursuant to the agreement.

78.     Defendant's conduct, as set forth above, was arbitrary, capricious, or in bad faith.

79.     Due to defendant's breach of the agreement, plaintiff has incurred damages as set forth above, in excess of $500,000.

Wherefore, plaintiff, Matthew James Conaway, respectfully requests that judgment be entered in his favor and against defendant, The University of Chicago, in an amount in excess of $500,000, to be specifically proven at trial, together with costs of suit, and such further relief as is just and proper.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

80.    Plaintiff incorporates paragraphs 1-57.

81.    Defendant's conduct as alleged above, was extreme and outrageous.

82.    Defendant knew that there was at a high probability that its conduct would cause severe emotional distress to plaintiff.

83.    Defendant's conduct did in fact cause plaintiff severe emotional distress, together with various physical symptoms arising from his distress.

84.    Punitive damages against defendant are necessary and appropriate, to deter defendant and others similarly situated from acting in such a manner in the future.

Wherefore, plaintiff, Matthew James Conaway, respectfully requests that judgment be entered in his favor and against defendant, The University of Chicago, in an amount to be specifically proven at trial, together with punitive damages, costs of suit, and such further relief as is just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.


MATTHEW JAMES CONAWAY


By:   /s/ Glenn E. Heilizer
          One of his attorneys

Glenn E. Heilizer
Heilizer Law Offices
Five North Wabash Avenue
Suite 1304
Chicago, Illinois 60602
312-759-9000
glenn@heilizer.com
ARDC No. 6196412

Dated:  August 18, 2015